IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

American Association of Cosmetology
Schools,

                          Plaintiff,                    Civil Action No. 17-263 RC

              v.

Elisabeth DeVos, Secretary of Education,

                          Defendant.


## COSMETOLOGY SCHOOLS' MOTION FOR A PRELIMINARY
## INJUNCTION AND REQUEST FOR EXPEDITED CONSIDERATION

Date: February 23, 2017

Robert L. Shapiro, DC Bar No 415854
Edward Cramp (admitted *pro hac vice*)
Drew T. Dorner, DC Bar No 1035125
Duane Morris LLP
505 Ninth Street, NW
Washington, DC 20004
(202) 776-7867 (Telephone)
(202) 330-5260 (Facsimile)
Counsel for Plaintiff

## TABLE OF CONTENTS

**Page**

BACKGROUND ...................................................................................................................2

    A.    Statutory and Regulatory Background ...................................................................... 2

    B.    Cosmetology Graduates' Income Is Undercounted by the GE Rule's Data ........... 6

    C.    Impact of GE Rule on Cosmetology Programs ...................................................... 10

ARGUMENT ....................................................................................................................12

    A.    The Cosmetology Schools are Likely to Succeed in Showing that the
            Department's Application of the Gainful Employment Standard to
            Cosmetology Schools is Arbitrary and Capricious ............................................... 12

            1.    The Department's GE Rule Uses Bad Data ............................................... 17

            2.    The Department Failed to Consider the Relevant Factor of the Prevalence
                    of Underreporting of Income in the Cosmetology Industry ...................... 19

            3.    The Department Failed to Consider Credible Alternatives to the Use of
                    Income Data that Is Flawed with respect to the Cosmetology Industry ... 20

    B.    Cosmetology Schools Are Likely to Suffer Irreparable Harm Absent
            Preliminary Relief ................................................................................................ 21

    C.    The Balance of Equities Favors the Grant of Preliminary Relief ......................... 22

    D.    The Grant of a Preliminary Relief Is in the Public Interest .................................. 23

CONCLUSION ..................................................................................................................24

# TABLE OF AUTHORITIES

## Federal Cases

*Association of Private Sector Colls. and Univs. v. Duncan*, 870 F. Supp. 2d 133 (D.D.C 2012) ...................................................................................................3

*District Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46 (D.C. Cir. 2015) .......................................17

*Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291 (9th Cir. 2003) ..........................................18

*Friends of Boundary Waters Wilderness v. Bosworth*, 437 F.3d 815 (8th Cir. 2006) ...................................................................................................18

*Greatness v. F.E.C.*, 831 F.3d 500 (D.C. Cir. 2016) ....................................................12

*International Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795 (D.C. Cir. 1983) ................................................................................. Passim

*League of Women Voters v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ....................................12, 21, 23

*Leather Indus. of Am., Inc. v. E.P.A.*, 40 F.3d 392 (D.C. Cir. 1994) ......................................16, 20

*Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)..............................................................................13, 15, 20

*New York Cross Harbor R.R. v. Surface Transp. Bd.*, 374 F.3d 1177 (D.C. Cir. 2004) ...................................................................................................12

*PPL Wallingford Energy LLC v. F.E.R.C.*, 419 F.3d 1194 (D.C. Cir. 2005) ................................13

*Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo, S.A. de C.V.*, 901 F. Supp. 2d 54 (D.D.C. 2012) ...................................................................................21

*Puerto Rico Higher Educ. Assistance Corp. v. Riley*, 10 F.3d 847 (D.C. Cir. 1993) ............. 15-16

*Resolute Forest Prods., Inc. v. U.S. Dep't of Ag.*, 187 F.Supp.3d 100 (D.D.C. 2016) ................................................................................ 17-18

*St. Lawrence Seaway Pilots Ass'n v. U.S. Coast Guard*, 85 F.Supp.3d 197 (D.D.C. 2015) ...................................................................................................18

*U.S. v. Williams*, 573 F.2d 284 (5th Cir. 1978)...........................................................................19

## Federal Statutes and Rules of Court

5 U.S.C. § 706(2)(A)...................................................................................................12

20 U.S.C. § 1001(a)(2), (5), 1002(b)(1)(B), (D), (c)(1)(B) .............................................................2

20 U.S.C. § 1002(b)(1)(A) ................................................................................................2

20 U.S.C. § 1070(a) .........................................................................................................2

26 U.S.C. 7206 ...............................................................................................................20

Fed. R. Civ. P. 65(a) .......................................................................................................1

**Regulations**

34 C.F.R. Part 668 Subpart N ........................................................................................22

34 C.F.R. Part 668 Subpart N. Title IV ...........................................................................2

34 C.F.R. § 668.206(a) ...................................................................................................22

34 C.F.R. §§ 668.402-04 ..................................................................................................3

34 C.F.R. §§ 668.402, 404(b)-(d) .................................................................................3, 5

34 C.F.R. § 668.403(c)(1) ................................................................................................4

34 C.F.R. § 668.403(c)(2) ................................................................................................4

34 C.F.R. § 668.403(c)(4)(i) ............................................................................................4

34 C.F.R. § 668.403(c)(4)(ii) ...........................................................................................4

34 C.F.R. § 668.404(b)(2) ................................................................................................3

34 C.F.R. § 668.405(f)(3)(i) .............................................................................................4

34 C.F.R. § 668.406, and (2) ..........................................................................................24

34 C.F.R. § 668.406(a) .....................................................................................................5

34 C.F.R. § 668.406(b) .....................................................................................................5

34 C.F.R. § 668.406(e)(i) ..................................................................................................5

34 C.F.R. § 668.406(e)(ii) .................................................................................................6

34 C.F.R. § 668.410(a)(2)(i) .........................................................................................4, 24

34 C.F.R. § 668.410(a)(2)(ii) ............................................................................................5

34 C.F.R. § 668.410(a)(2)(iii)(7) ......................................................................................5

34 C.F.R. § 668.410(b) ...................................................................................................12

34 C.F.R. § 668.410(b)(2)(i), (iv) ............................................................................................4

34 C.F.R. § 685.214 .................................................................................................................23

76 Fed. Reg. 34,386, 34,448 (June 13, 2011) .................................................................3

79 Fed. Reg. 64,890, 64,955, 64,956 (October 31, 2014).................................................3, 8, 9, 19

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

American Association of Cosmetology
Schools,

                                        Plaintiff,                    Civil Action No. 17-263 RC

                        v.

Elisabeth DeVos, Secretary of Education,

                                        Defendant.

COSMETOLOGY SCHOOLS' MOTION FOR A PRELIMINARY
INJUNCTION AND REQUEST FOR EXPEDITED CONSIDERATION

The American Association of Cosmetology Schools ("AACS" or "Cosmetology

Schools") moves, pursuant to Fed. R. Civ. P. 65(a) and Local Rule (LCvR) 65.1(c), for a

preliminary injunction staying application of the appeals and warning provisions of the

Department of Education's ("Department") Gainful Employment ("GE") regulations (or "GE

Rule") to cosmetology programs pending final resolution of this matter.  Cosmetology Schools

also request expedited consideration of this motion by March 10, 2017, pursuant to LCvR

65.1(d).

As set out in AACS' complaint, the Department's GE regulations impose draconian

consequences on schools listed as having a "failing" debt/income ratio.  As is also set out in the

complaint, the GE regulations are arbitrary and capricious as applied to AACS' member schools'

cosmetology programs, as (1) these ratios are based on flawed income data as it pertains to the

graduates of AACS' member schools' cosmetology programs, (2) the Department was aware of

the flaws in the data during the GE rulemaking, yet the Department failed to materially address

this issue in its publication of the final GE rule; and (3) the Department failed to materially address credible alternatives to use of the flawed income data offered during the GE rulemaking. Cosmetology Schools are already suffering irreparable harm due to the Department's application of the GE Rule.  The number of schools impacted and extent of the harm will increase dramatically if relief is not granted by March 10, 2017.  The interests of third parties – particularly students currently enrolled in AACS' member schools' cosmetology programs – would be furthered by a preliminary injunction, and the public interest favors the avoidance of arbitrary and capricious agency action.  Accordingly, a preliminary injunction is appropriate to stop the draconian enforcement of the GE rule pending resolution of this matter.

## BACKGROUND

A.     Statutory and Regulatory Background

A primary purpose of Title IV of the Higher Education Act of 1965 ("HEA") is to assist in making available the benefits of postsecondary education to eligible students through federal student aid.  20 U.S.C. § 1070(a).  The HEA provides requirements for schools participating in Title IV HEA student aid programs, including requiring that they be authorized in the state in which the school operates and that the school be accredited by an agency recognized by the Secretary.  20 U.S.C. § 1001(a)(2), (5), 1002(b)(1)(B), (D), (c)(1)(B).  Title IV of the HEA further protects students and the taxpayers against programs with high federal student debt default rates by prohibiting the participation of schools with cohort default rates above specified levels.  34 C.F.R. Part 668 Subpart N.  Title IV provides financial aid to students attending programs offered by proprietary institutions that prepare students for "gainful employment" in a recognized occupation ("GE programs").  20 U.S.C. § 1002(b)(1)(A).  AACS members are predominantly proprietary institutions of higher education as defined in the HEA.

Although the term "gainful employment" has been in the HEA since its enactment more than fifty years ago, the Department did not attempt to promulgate regulations interpreting that term until 2009.  In a rulemaking begun in 2009 that resulted in the publication of a final rule in 2011, the Department attempted to determine if a GE program provided for gainful employment by looking at a debt-to-earnings test and a loan-repayment test.  76 Fed. Reg. 34,386, 34,448 (June 13, 2011).  This Court struck down that rule.  *Association of Private Sector Colls. and Univs.* v. *Duncan*, 870 F. Supp. 2d 133 (D.D.C 2012).  The Department did not appeal this Court's ruling.

Instead, the Department promulgated a new set of regulations that purport to interpret the "gainful employment" language in the HEA.  79 Fed. Reg. 64890 (October 31, 2014).  The new GE Rule compares the median annual loan payment of a GE program's recent graduates who received Title IV program assistance to the higher of the mean or median annual earnings of those graduates as reported by the Social Security Administration ("SSA") to calculate an annual earnings rate and discretionary income rate ("D/E Rates").  34 C.F.R. §§ 668.402-04.  The D/E Rates are calculated based on a cohort of students who graduated in a two-year period — the third and fourth award years prior to the most recent award year — or, if that two-year cohort contains fewer than 30 graduates, a four-year period.  34 C.F.R. §§ 668.402, 404(b)-(d).  A graduate's annual loan payments in the D/E Rates is calculated by amortizing the graduate's median loan debt over a 10-year repayment period for certificate and associate degrees, 15 years for bachelor's and master's degrees and 20 years for doctoral and first professional degrees.  34 C.F.R. § 668.404(b)(2).

The GE regulations rely solely on SSA data for the Department's determination of GE program graduates' annual earnings for calculation of both the draft and final 2015 D/E Rates.

The GE regulations state expressly that the Secretary will not consider in a challenge to the draft D/E Rates any objection to the mean or median annual earnings that SSA provided to the Secretary.  34 C.F.R. § 668.405(f)(3)(i).

A GE program passes if the annual earnings rate is less than or equal to 8% or the discretionary income rate is less than or equal to 20%.  34 C.F.R. § 668.403(c)(1).  A GE program fails if the annual earnings rate exceeds 12% and the discretionary income rate exceeds 30%.  34 C.F.R. § 668.403(c)(2).  A GE program is "in the zone" if it falls between the passing and failing thresholds.  A GE program that fails twice in any three consecutive years for which D/E Rates are calculated for that program loses Title IV eligibility.  34 C.F.R. § 668.403(c)(4)(i).  A GE program loses eligibility if in each of four consecutive years for which D/E Rates are calculated for that program it is either in the zone or failing.  34 C.F.R. § 668.403(c)(4)(ii).  A school cannot reestablish eligibility for a GE program (or establish eligibility for a "substantially similar" program) that has lost eligibility under these regulations for three years.  34 C.F.R. § 668.410(b)(2)(i), (iv).

Schools with a failing GE program that may lose eligibility the following year if the program fails again must provide warnings to current and prospective students as follows:  "This program has not passed standards established by the U.S. Department of Education.  The Department based these standards on the amounts students borrow for enrollment in this program and their reported earnings.  If in the future the program does not pass the standards, students who are then enrolled may not be able to use federal student grants or loans to pay for the program, and may have to find other ways, such as private loans, to pay for the program."  34 C.F.R. § 668.410(a)(2)(i).  Schools with a zone GE program that may lose eligibility the following year if the program has a zone or failing rate for a fourth consecutive award year must

provide the same warning.  In addition to providing warnings, the school must also refer students and prospective students to (and include an internet link for) College Navigator, its successor site, or another similar federal resource, for information about other similar educational programs offered at other institutions.  34 C.F.R. § 668.410(a)(2)(ii).  The school must provide the warning on the school's website and in promotional materials.  34 C.F.R. § 668.410(a)(2)(iii)(7).

The Department issued the first set of final D/E Rates for each GE program, referred to by the Department as Debt Measure Year 2015 GE D/E Rates (below, "2015 D/E Rates"), on or about January 9, 2017.  *See* Decl. of Anthony Civitano Decl. ¶ 9.  The 2015 D/E Rates published by the Department on or about January 9, 2017 use aggregate mean or median calendar year 2014 earnings for students in a GE program who graduated during the 2010-11 and 2011-12 award year as reported for those graduates to the SSA (or, if that two-year cohort contains fewer than 30 graduates, includes graduates for a four-year period including the 2008-2009 and 2009-2010 award years).  34 C.F.R. §§ 668.402, 404(b)-(d).

The GE regulations establish limited grounds under which a school may appeal the 2015 D/E Rates.  To challenge the annual earnings portion of the 2015 D/E Rates, a school must submit an alternate earnings appeal to request recalculation of the GE program's rates.  34 C.F.R. § 668.406(a).  Such appeals must rely on either (1) an institutional survey of a GE program's graduates, or (2) a state-sponsored data system.  34 C.F.R. § 668.406(b).  To pursue an alternate earnings appeal of the 2015 D/E Rates issued on or about January 9, 2017, schools had to submit a notice of intent to submit an appeal within 14 days of issuance of the final rates or by January 23, 2017.  34 C.F.R. § 668.406(e)(i).  To pursue an appeal, a school must submit all certifications and specified supporting documentation related to the appeal no later than 60 days after the

Secretary issues the notice of determination informing the school of the 2015 D/E Rates, or by

March 10, 2017.  34 C.F.R. § 668.406(e)(ii).

      B.    <u>Cosmetology Graduates' Income Is Undercounted by the GE Rule's Data</u>

      The SSA data relied upon by the Department in the GE Rule is known to undercount the

income of three types of workers:  (1) self-employed individuals, (2) those paid in cash, and (3)

those paid with tips.  *See* Civitano Decl. ¶ ¶ 25-26; Brodie Decl. ¶ 3, referencing exhibits:

*Deconstructing the Tax Code: Uncollected Taxes and Issues of Transparency: Hearing Before*

*the S. Comm. on Homeland Security and Gov't Affairs, Subcomm. on Fed. Fin. Mgmt., Gov't*

*Info. and Int'l Sec.*, 109th Cong. (Sept. 26, 2006) (written statement of The Honorable J. Russell

George, Treasury Inspector General for Tax Administration) at 10, 12 15; "Additional

Enhancements Could Improve Tax Compliance of Employees Who Receive Tips," Report of the

Treasury Inspector General for Tax Administration, Reference Number 2006-30-132 (September

15, 2006); *see also* "Tax Tips for the Cosmetology & Barber Industry," IRS Publication 4902,

Catalog Number 56037B (acknowledging prevalence of independent contractor status and

gratuities for workers in this industry); "Tips on Tips," IRS Publication 3144 (Rev. 3-2015)

Catalog Number 26288G (noting IRS objective of improving compliance with tip reporting

requirements, a tacit acknowledgment of the challenge of obtaining such compliance); "Tips on

Tips," IRS Publication 3148 (Rev. 8-2006), Catalog Number 26307C at 5 (acknowledging that

"a significant number of taxpayers are not reporting all their tip earnings as taxable income"

notwithstanding the fact that such reporting "has always been the law").  Such individuals have

an incentive to underreport such income in order to reduce their federal and state payroll tax

liabilities.  In addition, such self-reporting places a material record-keeping burden on the

individuals receiving such income.  Notwithstanding laws requiring accurate reporting of self-

employment and gratuity income, as a group, individuals receiving such income tend to

underreport it either because of a lack of accurate records or in order to reduce their tax liability. *Id*. This underreporting is particularly prevalent where a significant portion of the income is received in cash, making it more difficult to trace to the individual receiving it. *Id.* This underreporting is frequently referred to as an "income gap" or "tax gap."

The only two bases for submitting an alternate earnings appeal permitted by the GE regulations also rely on self-reporting of income by individuals. Accordingly, the data obtained from these alternatives will also underreport the earnings of such individuals. The institutional survey alternative ameliorates the impact of some potential concerns regarding payroll tax liability through assurances to responding program graduates that their responses will not be shared with taxing authorities. But such confidentiality cannot completely address such concerns. Moreover, such confidentiality does not address the tendency of individual receiving significant portions of their incomes in cash and through gratuities to underreport such income due to imprecise record-keeping.

In addition, the alternative of developing an institutional survey permitted by the GE regulations is costly and burdensome on schools with GE programs. Civitano Decl. ¶ 29; Varol Decl. ¶ 9; Rosenberg Decl. ¶¶ 8-9. And at least some of the schools that have attempted to pursue such a survey have found it impossible to attain the required and onerous 50% participation level despite expending significant and costly efforts to contact program graduates. *See* Declarations of Mez Varol ¶ 8 and Robert Rosenberg ¶ 8.

Further, in many states, there is no alternative state-sponsored data system containing annual earnings data for individuals in the measured cohort. E.g., Varol Decl. ¶ 10, Rosenberg Decl. ¶ 11. Accordingly, this basis for submitting an alternate earnings appeal is unavailable to some schools.

7

The Department was informed of this well-known reported income gap phenomenon by numerous commenters during the rulemaking leading to promulgation of the GE regulations. *See* Declaration of Katherine Brodie attaching comments from Record of GE regulation rulemakings (Letter from Shore Beauty School (September 8, 2010) at 3-4; Letter from Association of Proprietary Colleges (May 27, 2014) at 54-55; Quad Partners LLC submission of September 9, 2010 at 10-11; Letter from Gallegos Legal Group (May 26, 2014) at 8, 15 and 17; attached report of Professor Eric Bettinger; AACS comments dated May 27, 2014).  In addition, the Department was informed that this reported income gap phenomenon is particularly prevalent among cosmetology program graduates.  *Id.* (submissions from Shore Beauty School, Quad Partners LLC, and AACS).

In its publication of the GE regulations as a final rule, the Department acknowledged the reported income gap.  In particular, the Department "acknowledge[d] that some self-employed individuals may fail to report, or underreport, their earnings" despite the fact that such individuals are legally required to report such income if they earn $400 or more in a taxable year and would be subject to penalties and criminal prosecution if they fail to do so.  79 Fed. Reg. at 64955.  Notwithstanding its acknowledgement of the reported income gap phenomenon, the Department failed to substantively address the issue so as to either justify the use of such seriously flawed data or to ameliorate the impact of the income gap on the 2015 D/E Rates calculated for cosmetology programs.

The Secretary was informed of multiple alternatives to reliance on self-reported income by numerous commenters during the rulemaking leading to promulgation of the GE regulations. For example, in their comments noted above, Quad Partners LLC and AACS suggested that data from the Bureau of Labor Statistics would better serve the purpose of measuring the true

incomes of graduates of cosmetology programs.  Professor Bettinger suggested adjusting the

SSA or BLS data on cosmetology program graduates' income upward by a percentage consistent

with government reports estimating the extent of the underreporting of tip income.  Other

alternatives are obvious based on the GE rule itself.  For example, as explained above, the GE

Rule provides schools with the option of confidentially surveying its program graduates to

provide an alternative earnings calculation.  For an individual school, the creation of such a

survey is hugely burdensome.  But the Department obviously could have performed a similar

survey of cosmetology program graduates, compared the results to SSA or BLS data to measure

the underreporting of income and then used the resulting adjustment factor to adjust the SSA

data for individual programs to more accurately measure the income of their graduates.

Notwithstanding the Department being informed of such alternatives, the Department

gave short shrift to these alternatives in the promulgation of the final GE regulations.  The

Department did not address at all the use of BLS data, nor did it address the obvious alternative

noted above of creating a survey to adjust the income of cosmetology program graduates to more

accurately reflect their incomes.

The Department dispatched with a single sentence the alternative of adjusting SSA data

to reflect the extent of underreporting of tip, cash and self-employed income.  79 Fed. Reg. at

64956.  The Department complains that adjusting income data upward by a percentage to reflect

the underreporting of tip, cash and self-employed income would not enable differentiation

among different programs.  *Id.*  The Department is wrong, as shown in a simple example:  (1)

assume that two programs have SSA income data for their programs' graduates of $10,000 and

$20,000, (2) assume that survey data lead to calculation of an adjustment factor to reflect

underreporting of tip and cash income of 25%, leading to adjustments of $2,500 and $5,000 for

the two programs, (3) adjusted average income for the two programs would then be $12,500 and

$25,000 respectively.  In this simple example, differentiation among programs is preserved –

both the size of the adjustment and the adjusted total income figures would be higher for the

program whose graduates have higher incomes as reported by SSA.  The adjusted income

amounts would more accurately reflect the true incomes of such programs' graduates by taking

into account the known fact that tip, cash and self-employed income is underreported.[1]

  C. <u>Impact of GE Rule on Cosmetology Programs</u>

  AACS is a national, non-profit association open to accredited privately-owned schools of

cosmetology arts and sciences.  Its membership is comprised of cosmetology, skin, nail,

barbering, make-up and massage schools.  Civitano Decl. ¶ 3.  Most of the programs offered by

these schools are GE Programs under Title IV of the HEA.  *Id.* ¶ 6.  These programs are

identified by the following CIP codes: 120401-99 (Cosmetology) and 513306 and 513501

(Massage).  A typical student enrolled at Cosmetology Schools is female, *id.* ¶ 5, independent

(meaning not a dependent for federal income tax purposes and eligible for larger federal student

loan amounts) and low income.

  Graduates of GE programs that prepare students for cosmetology related occupations

tend to be self-employed.  Civitano Decl. ¶ 25.  Such self-employment includes individuals who

"rent a chair" at a salon.  *Id.*  Cosmetology program graduates tend to receive a significant

portion of their incomes in the form of tips.  *Id.*  Cosmetology program graduates also tend to

receive a significant portion of their incomes in cash.  *Id.*  Because of these attributes of

---

1 The Department addressed other comments from Professor Bettinger suggesting the use of
Current Population Survey ("CPS") data to estimate the income of program graduates.  Although
AACS disagrees with the Department's rejection of Professor's comments regarding CPS data,
that disagreement is not the basis for its request for a preliminary injunction here.

cosmetology program graduates and the fact that SSA data undercounts the income of

individuals with such attributes, SSA data undercounts the income of cosmetology program

graduates as a group.

As some Cosmetology Schools are undertaking alternate earnings appeals, preliminary

data from their independent surveys of cosmetology program graduates' incomes is becoming

available (as noted above, the final appeals submittals are not due until March 10, 2017).  That

preliminary data demonstrates the extent of the income gap for such graduates, as the survey data

is frequently showing higher incomes, in some cases 100% higher than the data in the SSA

database.  Civitano Decl. ¶ 28.

Cosmetology Schools that were unable to appeal their failing 2015 D/E Rates have

already posted the dire warnings as required by the GE Rule.  Civitano Decl. ¶¶ 33-34.  As

expected, in just the first two weeks since posting of the warnings, these warnings are having a

devastating impact on schools posting them.  Schools are experiencing dramatic declines in new

enrollments and progress toward new enrollments in their affected cosmetology programs.

Civitano Decl. ¶ 36; Varol Decl. ¶ 15; Rosenberg Decl. ¶ 24.

Furthermore, the warnings are immediately putting the very existence of these schools in

imminent danger.  Most Cosmetology Schools specialize in cosmetology and offer only one to

three cosmetology programs.  Civitano Decl. ¶ 39.  The loss of even one GE Program at these

schools will quickly put those schools out of business.  The schools require a steady flow of new

students and the related tuition dollars to stay in business.  Varol Decl. ¶ 17.  If schools miss

even a single session of enrollment, they will likely fail because they face large fixed costs (e.g.,

specialized classroom facilities).  *See id.*  Further, the loss of a GE Program cannot be countered

by establishing new educational programs to take advantage of those fixed costs, because the GE

Rule prohibits a school from discontinuing a failing GE Program and establishing a new GE Program that is substantially similar as reflected by use of the same four-digit CIP code. 34 C.F.R. § 668.410(b); Civitano Decl. ¶ 37. Thus, cosmetology schools with failing GE Programs are prohibited from establishing any new cosmetology programs. *Id.*

ARGUMENT

The standard for the grant of a preliminary injunction motion is well-known: "A party seeking a preliminary injunction must make a 'clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest.'" *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (citing *Pursuing Am.'s Greatness v. F.E.C.*, 831 F.3d 500, 505 (D.C. Cir. 2016). As all of these factors are present here, the grant of a preliminary injunction is appropriate.

A.  The Cosmetology Schools are Likely to Succeed in Showing that the Department's Application of the Gainful Employment Standard to Cosmetology Schools is Arbitrary and Capricious

In crafting the GE Rule, the Department arbitrarily and capriciously disregarded the significant underreporting of income in the cosmetology industry. Contravening longstanding precedents of the D.C. Circuit, the Department (1) deliberately used income data it knew to be faulty with respect to the cosmetology industry, (2) responded dismissively and unsatisfactorily to concerns expressed during the GE rulemaking, (3) failed to consider all relevant factors, and (4) failed to consider credible alternatives as mandated by APA.

An agency's action should be held unlawful and set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency actions are arbitrary and capricious unless, *inter alia*, the agency "consider[ed] all the relevant factors" in reaching its decision. *New York Cross Harbor R.R. v. Surface Transp. Bd.*, 374 F.3d

12

1177, 1181 (D.C. Cir. 2004).  A rule is similarly arbitrary and capricious if the agency "entirely

failed to consider an important aspect of the problem, [or] offered an explanation for its decision

that runs counter to the evidence before the agency."  *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v.

State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  When an interested party identifies a

potential incompatibility with a proposed regulation, an agency acts arbitrarily and capriciously

by failing to consider reasonable alternatives to correct the incompatibility.  *See International

Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 815 (D.C. Cir. 1983) ("*ILGWU*");

*see also PPL Wallingford Energy LLC v. F.E.R.C.*, 419 F.3d 1194, 1198 (D.C. Cir. 2005)

("[U]nless the agency answers objections that on their face seem legitimate, its decision can

hardly be classified as reasoned.").  An agency must "examine the relevant data and articulate a

satisfactory explanation for its action including a rational connection between the facts found and

the choices made."  *ILGWU* at 814 (citing *Motor Vehicles*, 463 U.S. at 43 (internal quotes and

citation omitted).

　　　　In *ILGWU*, the petitioners challenged the Secretary of Labor's rescission of

"longstanding restrictions of the employment of workers in their homes (homeworkers) in the

knitted outerwear industry."  *Id*. at 799.  The petitioners argued that removing the restrictions

against "homework" would make it impossible for the government to "effectively enforce the

minimum wage, overtime compensation and child labor provisions" of the Fair Labor Standards

Act ("FLSA"), and that the payment of sub-minimum wages to homeworkers would "cause

competitive injury to employers complying" with the FLSA.  *Id*.  The petitioners' claim – that

"[e]ffective regulation of homework is impossible" – was supported by comments and

documents within the administrative record before the agency.  *Id*. at 800 n.1.

　　　　The Secretary nonetheless decided to remove the restrictions against homework based on

his finding that "substantial curtailment of employment opportunities and earning power will result from a continuation of the restrictions on industrial homework in the knitted outerwear industry." *Id*. at 804-05.  However, on appeal, the D.C. Circuit found that the Secretary "failed to give adequate consideration to the differences between enforcing the [FLSA] when homeworkers are used in rural areas and when they are used in urban areas" because the Secretary over-relied on "testimony and comments of individuals from rural Vermont." *Id*. at 823-24.  The court determined that "testimony from enforcement officials in more urban states[ ] emphasized the substantial differences between rural and urban areas, and indicated that the conditions requiring restrictions [against homework] in urban areas were not duplicated in rural areas." *Id*. at 824.  The court found that the agency heard (and rejected) "[s]pecific proposals . . . that would have permitted accommodation of these differences by means short of complete rescission of restrictions," noting the obvious option to "permit homework only in situations where . . . impediments to factory employment are shown to exist." *Id*. at 816.

This "artificial narrowing of options," the D.C. Circuit held, was "antithetical to reasoned decisionmaking and [could] not be upheld." *Id*. (citing *Pillai v. CAB*, 485 F.2d 1018, 1027 (D.C. Cir. 1973)).  While an agency is not required to "include every alternative device and thought conceivable by the mind of man" in its consideration, "options . . . specifically mentioned in . . . the comments received by the Secretary" cannot be ignored in a reasoned decision-making process. *Id*. at 817.  An agency "*must* respond *in a reasoned manner* to explain how the agency resolved any significant problems raised by the comments, and to show how that resolution led the agency to the ultimate rule." *Id*. (citing *Rodway v. U.S.D.A.*, 514 F.2d 809, 817 (D.C. Cir. 1975) (emphasis added)).  An agency's claim "that it had in fact considered the alternatives," or an "attempt to rely on generalized and conclusory policy considerations as grounds for rejecting

14

them" is inadequate.  *Id*.  Because the Secretary of Labor failed to "address common and known

or otherwise reasonable options, and to explain any decision to reject such options," the court

vacated the agency's rule.  *Id*. at 818, 828.

In addition to considering alternatives, an agency must consider all relevant factors

germane to a proposed decision.  *Motor Vehicles*, 463 U.S. at 43.  In *Puerto Rico Higher Educ.*

*Assistance Corp. v. Riley*, 10 F.3d 847 (D.C. Cir. 1993), the Puerto Rico Higher Education

Assistance Corporation ("PRHEAC"), a student loan guaranty agency, sued the Department after

the Department recovered approximately $4.4 million from PRHEAC pursuant to a 1987 statute

capping the amount of cash that student loan guaranty agencies could maintain as cash reserves.

10 F.3d at 849-50.  The statute required the Department to recover any cash above the cap held

by a guaranty agency, but it "authorized the Department to waive 'recovery' of an agency's

excess cash reserves" if the guaranty agency applied for a waiver and the Department determined

that the agency met one or more of three statutory conditions.

In response to a notification that the Department intended to recover excess reserve

funds, PRHEAC filed an application for a waiver, citing eight factors it alleged showed that

PRHEAC would face hardship if its cash reserves were stripped away.  The Department, despite

claiming it conducted an "exhaustive review" of PRHEAC's waiver application, denied the

waiver application, relying only on the facts that PRHEAC's total cash reserves had grown from

$6.3 million in 1986 to approximately $17 million in 1987 while its default rate declined during

the same period.  *Id*. at 852.  The D.C. Circuit determined that the Department's decision "failed

to address many of the [other] factors upon which PRHEAC's waiver application was based and

failed to explain the Department's reasons for ignoring them."  *Id*.

According to the D.C. Circuit, the Department's unexplained rejection of PRHEAC's

claim that its default rate had steadily increased; disregard of Puerto Rico's unemployment, disposable income, and workforce participation rates; and dismissal of PRHEAC's increased reinsurance payments and decreased earnings from insurance premiums "hardly exemplifie[d] reasoned decisionmaking." *Id*. The court held that the Department was permitted to exercise its discretion not to consider the "other relevant factors" identified by PRHEAC. However, it must have "expressly indicate[d] that it has done so," and it "must explain its rationale for doing so." *Id*. at 853. Without such declarations, "neither PRHEAC nor [the] court would be able to discern whether the Department considered and was unpersuaded by those factors or whether the Department simply excluded them from its decisionmaking process." *Id*.

The D.C. Circuit has also struck down as overbroad, generalized rules that fail to account for an individual party's unique circumstances. In *Leather Indus. of Am., Inc. v. E.P.A.*, 40 F.3d 392 (D.C. Cir. 1994), the petitioners challenged EPA regulations which set standards for the levels of ten pollutants commonly found in sewage sludge. 40 F.3d at 395-99. Because sewage sludge was considered a "valuable resource" that could be used as a "fertilizer or soil conditioner," the EPA based the challenged standards on assumed rates of sludge application to land (in terms of metric tons per hectare). The petitioners asserted that the EPA's assumed sludge application rates failed to account for the differences related to "heat-dried sludge," which "is applied at lower rates and for shorter duration" than other sludges, even though the petitioners pointed to "information in the record (1) regarding the actual rate and duration of use of heat-dried sludge, and (2) data showing that heat-dried sludge was not an anomalous type of land application." *Id*. at 402-03.

The court agreed with the petitioners, holding that while an agency "has discretion to design rules that can be broadly applied . . . an agency must justify its failure to account of

circumstances that appear to warrant different treatment for different parties." *Id.* at 403 (citing *Petroleum Commc'ns, Inc. v. FCC*, 22 F.3d 1164, 1172 (D.C. Cir. 1994)).  The court wrote, "Given that the EPA had at hand the information necessary accurately to prevent the known risks, it must [have] provide[d] some explanation for ignoring it in favor of blanket, highly conservative assumptions." *Id.*

Each of these aspects of arbitrary and capricious agency actions are applicable here.

1.      The Department's GE Rule Uses Bad Data

First, the government is improperly using income data that is manifestly bad in the context of the application of the GE Rule to cosmetology programs.  "[A]gencies do *not* have free rein to use inaccurate data," *District Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 56 (D.C. Cir. 2015) (emphasis in original), and an agency's failure to make a reasonable effort to obtain reliable data or, alternatively, provide an explanation as to why the use of inaccurate data is acceptable, means that the agency acted arbitrarily and capriciously.  "If an agency fails to examine the relevant data – which examination could reveal, *inter alia*, that the figures being used are erroneous – it has failed to comply with the APA." *Id.* at 57.

Recently, this Court struck down an agency decision that was based on faulty data.  In *Resolute Forest Prods., Inc. v. U.S. Dep't of Ag.*, 187 F.Supp.3d 100 (D.D.C. 2016), the Court was asked to determine whether the Secretary of Agriculture acted arbitrarily and capriciously in setting the threshold at which softwood lumber shipped by manufacturers or importers becomes subject to an assessment under the Commodity Promotion, Research and Information Act.  In setting the threshold at 15 million board feet per year, the Secretary relied on calculations based on "significant mismeasurements or inaccuracies." *Id.*  Finding the Secretary's decision arbitrary and capricious, this Court found that "none of the statistics cited [by the Secretary] c[ould] be reasonably relied upon to measure what they report." *Id.* at 123.

17

In another case, this Court invalidated the maximum rates, set by the U.S. Coast Guard, that pilots could charge while assisting cargo ships navigating the Great Lakes. *St. Lawrence Seaway Pilots Ass'n v. U.S. Coast Guard*, 85 F.Supp.3d 197 (D.D.C. 2015). Defending its rates, the Coast Guard stated that it relied upon aggregated data from contracts between the pilots' union and shipping companies. The Coast Guard claimed that prior to publishing its 2013 rates, the union confirmed to the Coast Guard that its aggregated data was "acceptable" for use in setting the pilots' pay rate. *Id*. at 202. However, when it came time to set the 2014 rates, the union "made clear the [union] did not endorse the numbers" in its data. *Id*. at 206. The Court found that the Coast Guard "did not address this [2014] comment except to note that it would not use what [union] provided as the correct figure because it included a season bonus." *Id*. The Court struck down the Coast Guard's 2014 rate, holding, "Because the Coast Guard provided no rational justification for its decision to continue using data *the source of which* affirmatively stated was inaccurate, this Court must find that its actions were arbitrary and capricious." *Id*. (emphasis in original). *See also Friends of Boundary Waters Wilderness v. Bosworth*, 437 F.3d 815 (8th Cir. 2006) (holding quotas set by U.S. Forest Service arbitrary and capricious where quotas were based on survey responses whose "deficiencies [were] so obvious the USFS should have considered the potential impact [they] might have on the trustworthiness of the surveys"); *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291 (9th Cir. 2003) ("if Plaintiffs are able to convince the district court that the agency unreasonably relied upon inaccurate data, they may be able to succeed on the merits of th[eir] claim.").

This matter involves an arbitrary and capricious agency action that went a step beyond *St. Lawrence Seaway Pilots* and *Resolute Forest Prods*. Although the agency's *data source* in *St. Lawrence Seaway Pilots* claimed its data was unreliable, in this case, *the agency itself*

18

acknowledges that its data are flawed.  *See* 79 Fed. Reg. 64955 ("We acknowledge that some

self-employed individuals may fail to report, or underreport, their earnings.").  Nonetheless, the

Department offers no explanation for its use of flawed information other than its perfunctory

response that the tax code pressures individuals to report all their income.  Given the

Department's concession that its data are inaccurate, coupled with its failure to adequately

explain why such data is nonetheless acceptable, the AACS is likely to succeed on the merits.

2.      The Department Failed to Consider the Relevant Factor of the Prevalence
of Underreporting of Income in the Cosmetology Industry

Second, the Department failed to consider the important relevant factor of underreported

income.  The Department makes the conclusory statement that its reliance on SSA earnings data

is not flawed because of underreported self-employed and tip income in the cosmetology

industry, but the Department fails to explain *why* the Department chose to disregard the

prevalence of such underreported income.  This is a fatal flaw as shown by the DC Circuit's

decisions in *ILGWU* and *PRHEAC*.  *ILGWU* instructs that the Department was required to

respond "*in a reasoned manner* to explain how the agency resolved any significant problems

raised by the comments, and to show how that resolution led the agency to the ultimate rule."

*ILGWU*, 722 F.2d at 817 (emphasis added).

The Department's conclusory statement in the GE final rule does not come close to

providing such a reasoned response.  Although the Department notes that underreporting of

income is unlawful, the Department makes no attempt to explain the connection between such

criminal liability and its decision to disregard known, substantial underreporting of income in the

cosmetology industry.  Of course, penalties for underreporting income have existed for decades,

*see e.g., U.S. v. Williams*, 573 F.2d 284, 290-91 (5th Cir. 1978) ("a person may be convicted if

he underreports the amount of gross income . . . .").[2]  Thus, the significant underreporting of

income in the cosmetology industry has gone on *despite* the fact that such underreporting has

been subject to criminal penalties.  The Department made no effort to explain in the publication

of the GE Rule in the Federal Register any "rational connection between facts [the phenomenon

of underreported income] and judgment [that the criminal tax laws sufficiently account for the

problem] required to pass muster under the 'arbitrary and capricious' standard."  *Motor Vehicle*

*Mfrs. Ass'n*, 463 U.S. at 56.  Accordingly, its GE Rule must be struck down on this score.

3.     The Department Failed to Consider Credible Alternatives to the Use of
Income Data that Is Flawed with respect to the Cosmetology Industry

Third, as in *ILGWU*, the Department failed to respond to "[s]pecific proposals . . . that

would have permitted accommodation[s]," *ILGWU*, 722 F.2d at 816, for industries affected by

underreported income.  The Department's response leaves credible alternatives unaddressed.  In

addition, as in *Leather Industries*, the Department has neglected to "justify its failure to account

of circumstances that appear to warrant different treatment for different parties."  *Leather*

*Industries*, 40 F.3d at 403.  This is yet another fatal flaw in the GE rulemaking with respect to

---

[2] The evidence of such underreporting of income is overwhelming and undeniable.  To the extent the Department is claiming that no such underreporting exists, the GE Rule is not in accordance with substantial evidence.  The U.S. House of Representatives' Office of Law Revision Counsel's online version of the United States Code indicates that section 7206 of the tax code, cited in *Williams*, has prohibited underreporting of income since 1954.  *See* Office of Law Revision Counsel, *26 USC 7206: Fraud and false statements*, UNITED STATES CODE (Jan. 17, 2017, 5:12 p.m.), http://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title26-section7206&num=0&edition=prelim; *see also* http://uscode.house.gov/statviewer.htm?volume=68A&page=852 (1954 version).  Underreporting of income has not waned since section 7206 was implemented.  *Cf.* U.S. INTERNAL REVENUE SERV., TAX GAP ESTIMATES FOR TAX YEARS 2008-2010 1 (2016), *available at* https://www.irs.gov/PUP/newsroom/tax%20gap%20estimates%20for%202008%20through%202010.pdf (estimating tax gap from 2008 to 2010 at approximately 18.3%); James Andreoni *et al.*, *Tax Compliance*, 36 J. of Econ. Lit. 819 (1998) ("The tax gap in 1992 represents about the same proportion of taxes owed, 17.3 percent, as in 1973."), *available at* http://darp.lse.ac.uk/papersdb/Andreoni_etal_(JEL98).pdf.

application of unadjusted SSA income data to cosmetology programs.

A party's showing that it is likely to succeed on the merits weighs in favor of granting that party a preliminary injunction.  *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016).  AACS can succeed on this prong of the preliminary injunction standard if it is likely to succeed on the merits of any of the flaws in the GE rulemaking noted above.  Here, Cosmetology Schools have demonstrated a clear likelihood of success on each of the fatal flaws in the Department's rulemaking.  Accordingly, this prong of the test weighs heavily in favor of granting a preliminary injunction.

B.      Cosmetology Schools Are Likely to Suffer Irreparable Harm Absent Preliminary Relief

"A showing of irreparable harm is the *sine qua non* of the preliminary injunction inquiry."  *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo, S.A. de C.V.*, 901 F. Supp. 2d 54, 57 (D.D.C. 2012) (citing *TD Bank, N.A. v. Pearl*, 891 F. Supp. 2d 103, 112 (D.D.C. 2012)).

Regrettably, enforcement of the current GE Rule is already causing irreparable harm to Cosmetology Schools.  As detailed above, the publication of the Debt-to-Earning rates, which are derived from SSA data based on underreported income, has already resulted in a sharp drop in enrollment at these schools.  Varol Decl. ¶ 13; Rosenberg Decl. ¶¶ 22-23. Indeed, it is difficult to imagine a more damaging scenario than having to post warnings (unfairly) that your school has bad results and to suggest that potential students look elsewhere.  In addition, the schools are expending large sums in a desperate effort to assemble an Alternative Earnings Appeal, although many expect that they will not be able to contact enough of their graduates to meet the standards required by the Rule.  Varol Decl. ¶ 8; Rosenberg Decl. ¶¶ 8-9.  Ultimately, the schools expect that they will have to end these programs very soon after having to post the warnings mandated

by the Rule.  Varol Decl. ¶¶ 17-18 ("almost immediately"), Rosenberg Decl. *Id.* ¶ 24-27 ("within weeks").  The loss of these programs will lead to the swift closure of the schools, as the programs are large parts of each school's operations.  *Id.*

While the difficulty in obtaining the data necessary to mount an appeal will bar many schools from ever filing one, any schools who have sufficient data must file their appeal by March 10.  Even if a given school is able to present an appeal, it may face a rejection of its appeal as early as March 11.  Accordingly, it is imperative that these Cosmetology Schools receive relief by March 10.

C.      The Balance of Equities Favors the Grant of Preliminary Relief

Having waited fifty years to define "gainful employment," the government cannot claim that there is sufficient urgency for the enforcement of its GE Rule against cosmetology programs to warrant denial of a preliminary injunction that would otherwise enable the Court to carefully consider AACS' claim on the merits.

Moreover, the relief sought here is limited.  Cosmetology programs' debt-income results would still be available for students to review.  And as reflected in the attached declarations from Messrs. Varol and Rosenberg, students are paying attention to that information even if schools are not specifically posting warnings about them.  *See* Varol Decl. ¶ 13, Rosenberg Decl. ¶¶ 22-23.  In addition, the public fisc is already fully protected by the government's Cohort Default Rule ("CDR"), which ensures that the graduates of schools with gainful employment programs are not defaulting on their federally insured student debt at levels higher than students graduating at comparable schools.  *See* 34 C.F.R. Part 668 Subpart N.  As a group, Cosmetology Schools' average cohort default rates are around 12%.  *See* Civitano Decl. ¶ 38.  That rate is far below the CDR's 30 percent threshold.  *See* 34 C.F.R. § 668.206(a).

More importantly, the absence of an injunction will cause severe harm to students

currently enrolled in cosmetology programs.  As explained above, absent relief from this Court, many cosmetology programs will close immediately, followed shortly by the closure of the schools of which they are a part.  As a result, all students currently enrolled at those schools (including students in programs that have not failed the GE Rule standard) will see their educations disrupted, perhaps irreparably.  *See* Rosenberg Decl. ¶ 26, Varol Decl. ¶ 18.  Moreover, the disruption of those students' educations will likely cost the taxpayers significant sums from the discharge of those students' federally insured debts, as permitted by current HEA Title IV rules.  *See* 34 C.F.R. § 685.214.  In addition, the closure of these programs and schools will lead to loss of employment for current staff.  *See* Rosenberg Decl. ¶ 26, Varol Decl. ¶ 18.  Further, the closure of these programs will lead to a loss of educations options for future students.

       D.       <u>The Grant of a Preliminary Relief Is in the Public Interest</u>

It is black letter law that there is no public interest in the perpetuation of unlawful government action.  *See League of Women Voters*, 838 F.3d at 12.  That is certainly the case here, as the Department's enforcement of the GE Rule to Cosmetology Programs clearly violates the APA.

It is worth emphasizing that the Cosmetology Programs are not bad schools.  They are state-regulated, and there is no suggestion that they are not meeting the requirements of their licenses and accreditations.  Further, as noted above, graduates of these programs are not defaulting on their student debts at high rates (otherwise, the schools would have run afoul of the Cohort Default Rules).

<u>CONCLUSION</u>

For the foregoing reasons, the Court should grant preliminary relief to AACS member

schools as follows pending resolution of this matter:  (1) stay the requirement of completing an

alternate earnings appeal under 34 C.F.R. § 668.406, and (2) stay the requirement of posting

warnings related required by 34 C.F.R. § 668.410(a)(2)(i).


Respectfully submitted,

Dated: February 23, 2017

/s/ Robert L. Shapiro
Robert L. Shapiro, DC Bar No 415854
Edward Cramp (admitted *pro hac vice*)
Drew T. Dorner, DC Bar No 1035125
Duane Morris LLP
505 Ninth Street, NW
Washington, DC 20004
(202) 776-7867 (Telephone)
(202) 330-5260 (Facsimile)
Counsel for Plaintiff

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

American Association of Cosmetology
Schools,

                              Plaintiff,                    Civil Action No. 17-263 RC

                   v.

Elisabeth DeVos, Secretary of Education,

                              Defendant.

<u>ORDER</u>

Upon consideration of Plaintiff's motion for a preliminary injunction, it Ordered that the

motion is granted.  Accordingly, the Defendant is Ordered to stay enforcement of the

Department's Gainful Employment Rule as follows:

 (1) stay the requirement of completing an alternate earnings appeal under 34 C.F.R.

§ 668.406, and

(2) stay the requirement of posting warnings related required by 34 C.F.R. §

668.410(a)(2)(i).



_____
Rudolph Contreras
United States District Judge